UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:20-cv-61136

JULISA SUAREZ-LAU,

      Plaintiff,

v.

P.D.K.N. HOLDINGS, LLC,
d/b/a PDKN RESTAURANT GROUP,

      Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Julisa Suarez-Lau ("Suarez-Lau"), by and through her undersigned attorney, hereby files this Complaint against Defendant, P.D.K.N. Holdings, LLC, d/b/a PDKN Restaurant Group ("PDKN"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, including by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) (the "PDA") (collectively "Title VII"); Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, as amended, including by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* (collectively the "ADA"); and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10, *et seq.* ("FCRA"), as amended.

## INTRODUCTION

1.     Suarez-Lau was employed by PDKN, which operates several restaurant and bar brands and concepts in the South and Southwest Florida regions, including Bokampers Sports Bar & Grill (with locations in Estero (Fort Myers area), Fort Lauderdale, Miramar, Naples and Plantation, Florida); Bo's Beach (located in Fort Lauderdale, Florida); Bo's Pub & Sports Bar

1

(located in Fort Lauderdale, Florida); and The Balcony Tapas & Live Music ("The Balcony") (located in Fort Lauderdale, Florida).

2.      Suarez-Lau initially worked as a server at Bo's Beach in early 2019. Suarez-Lau subsequently worked as a server and, later, a bartender at The Balcony.

3.      Suarez-Lau was adversely impacted and otherwise damaged by PDKN when it violated Title VII, the ADA and the FRCA when it discriminated against Suarez-Lau by terminating her because of her race, ethnicity and color (i.e., Asian), as well as her then-pregnancy[1].

## PARTIES, JURISDICTION AND VENUE

4.      Suarez-Lau, who is a current resident of Broward County, Florida, is a former employee of PDKN. Suarez-Lau worked as a server and, later, a bartender, at The Balcony from approximately March 2019 to on or about July 27, 2019.

5.      PDKN is a Florida limited liability company with its principle place of business in Fort Lauderdale, Broward County, Florida. PDKN operates restaurants and bar brands and concepts in Florida. PDKN owns and operates The Balcony, which is a New Orleans-inspired tapas, craft cocktail and live music restaurant located at 1309 East Las Olas Boulevard, Fort Lauderdale, Florida 33301. At all times relevant herein, PDKN employed at least fifteen persons, and was therefore an "employer" within the meaning of federal and state discrimination laws.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. § 1331 as this case involves questions of federal law. Further, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Suarez-Lau's state law claims also share all common operative facts with her federal law claims, and the parties are identical.

---

[1] On January 29, 2020, Suarez-Lau gave birth to her child.

Further, this Court's resolution of Suarez-Lau's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency and fairness to the parties.

7.        Venue is proper in the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b), wherein: (a) the violations of federal and state statutes occurred in this District; and (b) PDKN operates The Balcony, as well as conducts business operations and operates other restaurant facilities, in this District.

## FULFILLMENT OF ADMINISTRATIVE AND STATUTORY PREREQUISITES

8.        Suarez-Lau timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

9.        On March 11, 2020, the EEOC issued Suarez-Lau a Notice of Right to Sue.

10.        Suarez-Lau has timely filed this action and has complied with all administrative and statutory prerequisites to bring this lawsuit.

## GENERAL ALLEGATIONS

### Employment Start at The Balcony and the Pregnancy

11.        In March 2019, Suarez-Lau, who was previously employed as a server at PDKN-operated Bo's Beach in early 2019, started employment as a server at The Balcony.

12.        On or about May 5, 2019, Suarez-Lau was promoted to the position of, and started working as, a bartender. Suarez-Lau was informed of the promotion by bar "manager"[2] Jessica Messina. Due to the promotion, Suarez-Lau's last shift as a server occurred on or about May 27, 2019. [Note: Katie Bishop, server manager and event planner, prepared the schedules for the servers. Bishop stopped scheduling Suarez-Lau as a server after a recommendation from general manager Jon O'Neil for Messina and Bishop to resolve the scheduling issues involving

---

[2] In this position, Messina only possessed the authority to set the bartender schedules.

me. As a result of a discussion with Bishop, Messina scheduled Suarez-Lau to work bartender shifts full-time after approximately May 27, 2019.]

13.     On May 12, 2019, Suarez-Lau learned she was pregnant.

14.     On June 15, 2019, Suarez-Lau's boyfriend, shift key manager and server Anthony Dellatto, informed O'Neil about Suarez-Lau's pregnancy (Dellatto previously informed Messina, Bishop and assistant manager Charlie Pierra about the pregnancy).

15.     In late June 2019, during a bar shift, Messina made an unsolicited pregnancy-related comment to Suarez-Lau: "You look like you're showing a little bit." A few days later, when Suarez-Lau was working at the first-floor Main Bar, she requested Pierra to re-assign her to hosting duties during her final trimester. Pierra informed Suarez-Lau that "we would figure it out when the time comes."

16.     Suarez-Lau was not scheduled to work on June 28, 2019. However, in a series of text messages sent from Messina on June 27, 2019, at approximately 2:58 pm ET, Messina informed Suarez-Lau: "You'll be volume[3]" for the "World Cup quarter finals and USA plays" since "Johny [O'Neil] said to add someone." See Exhibit A. Thus, due to the anticipated large crowd for the 2019 Women's World Cup quarter-final contest between the United States of America and the French Republic, Messina scheduled Suarez-Lau to cover the Main Bar.[4] Suarez-Lau later observed on the HotSchedules app[5] that her shift was scheduled to begin at 10:30 am and conclude to "volume." See Exhibit B.

---

[3] A shift that concludes "to volume" means after the rush of customers or when the high volume of customers slows down at the restaurant.
[4] Generally, due to the average low customer volume on The Balcony's first floor on Friday afternoons, the managers did not schedule a bartender to work the Main Bar until 5:00 pm. However, the Women's World Cup game (as well as any other significant sporting events that occurred in the early afternoon on Fridays) generated larger-than-normal customer volume on the first floor of the restaurant.
[5] HotSchedules is an employee scheduling app used by The Balcony.

<u>The June 28, 2019 Shift</u>

17.    On June 28, 2019, Suarez-Lau began her shift at 10:30 am. Messina scheduled two additional bartenders to work the Main Bar on June 28, 2019: (1) a second bartender (Alice Lizardi) was scheduled to start her shift at 5:00 pm; and (2) a third bartender (Daniel Ortiz) was scheduled to start his shift at 6:00 pm. <u>See</u> Exhibit B. Messina, who rarely works evening/night shifts, was working as a bartender at one of the bars on the second floor.

18.    The Balcony's standard operating policy, procedure or protocol is for the manager who is closing the restaurant to determine when "volume" concluded during a shift.

19.    Due to the USA-France World Cup contest, "volume" concluded at approximately 4:50 pm when customers began leaving the restaurant at the conclusion of the game.

20.    At approximately 5:00 pm, Suarez-Lau cleaned up the Main Bar and "closed-out" the World Cup-viewing customers who wanted to pay and leave The Balcony.

21.    At approximately 5:15 pm, Bishop came to the Main Bar to "cash" Suarez-Lau out. Suarez-Lau asked Bishop if her shift had concluded. Bishop informed Suarez-Lau that her shift had concluded. Suarez-Lau clocked-out and proceeded to leave through the back of the building. Messina (who had walked down from the second floor for an unknown reason) saw Suarez-Lau begin to exit and asked "Where do you think you're going?" Suarez-Lau informed Messina that she was "going home" since she was supposed to stay until the conclusion of volume. Messina claimed Suarez-Lau was scheduled to leave after the "dinner" volume (which would occur approximately after 11:00 pm).[6] Suarez-Lau replied that interpretation would mean she would work a double shift and that was not the original intent of the schedule. Messina

---

[6] Messina's rationale is inconsistent with The Balcony's general scheduling protocols on Fridays. Specifically, if Suarez-Lau was scheduled to work a double shift until "dinner" volume on Friday, then the HotSchedules app would have displayed her schedule as consisting of two shifts—an "AM" shift that started at 10:30 am and a "PM" shift that started at 5:00 pm. <u>See</u> Exhibit B. Further, The Balcony rarely schedules a bartender to work a double shift beginning at 10:30 am and then to join two other bartenders to work a "PM" shift on the Main Bar. Instead, if three bartenders are necessary to staff the Main Bar, then the third bartender would normally start at 5:00 pm.

directed Suarez-Lau to remain at work. However, Messina, under The Balcony operating policy, procedure or protocol, did not possess the authority to do so.

22.     At approximately 5:30 pm, Bishop, who was in the doorway during the discussion, walked Suarez-Lau back inside the building. Bishop advised Suarez-Lau to ask Pierra for permission to leave since he was the evening manager. Suarez-Lau subsequently approached Pierra and informed the manager: (1) she had been working since 10:30 am; (2) volume had passed; and (3) the second Main Bar bartender (Alice Lizardi) had started her shift at 5:00 pm and the third Main Bar bartender (Daniel Ortiz) was starting his shift at 6:00 pm. See Exhibit B. Pierra responded: "Yes, it's fine if you left." The manager also asked Suarez-Lau to "[t]ake a load off tonight."

23.     Suarez-Lau left The Balcony at 5:37 pm. After Suarez-Lau arrived home, she received a text message from Messina. In the text, Messina informed Suarez-Lau that if she did not return to the restaurant, then Messina would not place Suarez-Lau on the schedule. Suarez-Lau, who was authorized to end her shift by Pierra, did not return to The Balcony.

<u>The Constructive Discharge</u>

24.     On June 30, 2019, Suarez-Lau was scheduled to work a shift. However, Messina removed Suarez-Lau from the schedule. Later, Demmi Hernandez, who is a White Hispanic female bartender, was terminated a second time[7] for not showing up for her shift.

25.     During the weekend of June 30, 2019, Hernandez and Suarez-Lau were removed from The Balcony's bartender group chat on WhatsApp.

26.     On or about July 1, 2019, The Balcony management re-hired (or revoked the termination decision regarding) Hernandez.

---

[7] The first occasion occurred on May 5, 2019, when Hernandez was terminated for being drunk at the bar. The management subsequently re-hired (or revoked the termination decision regarding) Hernandez after the May 2019 incident.

27.     On July 2, 2019, Suarez-Lau called the restaurant to speak with O'Neil. Suarez-Lau briefed O'Neil on what occurred on June 28, 2019. O'Neil informed Suarez-Lau that he would talk to the other managers and promised to call Suarez-Lau the next day. However, O'Neil did not call Suarez-Lau on July 3, 2019.

28.     On July 4, 2019, Suarez-Lau texted O'Neil. However, O'Neil did not respond.

29.     On July 5, 2019, Dellatto talked to O'Neil about Suarez-Lau's situation. O'Neil told Dellatto to advise Suarez-Lau to apologize to Messina.

30.     On July 6, 2019, in an attempt to resolve the situation and resume work, Suarez-Lau texted Messina and apologized.[8]

31.     During the July 8-9, 2019, period, Suarez-Lau attempted to communicate with O'Neil to inquire about her status, but O'Neil did not respond.

32.     On July 10, 2019, Suarez-Lau attempted to communicate with O'Neil to inquire about her status, but O'Neil did not respond. Later, Suarez-Lau traveled to the restaurant and talked with O'Neil. The general manager asked Suarez-Lau if she had talked with Messina. Suarez-Lau informed O'Neil of her apology to Messina. O'Neil stated that Suarez-Lau should speak with Messina about placing Suarez-Lau on the schedule since "it doesn't matter to me either way" and that the scheduling decision was up to Messina.

33.     Suarez-Lau texted Messina and told her of Suarez-Lau's conversation with O'Neil. Messina informed Suarez-Lau that bartender shifts were not available. Messina asked Suarez-Lau if she had talked to Bishop. Suarez-Lau informed Messina that she had not talked with Bishop because Bishop was not her manager. Messina informed Suarez-Lau that she was

---

[8] Suarez-Lau did not believe she was at fault. However, due to her need to maintain a sound financial base for the duration of her pregnancy, Suarez-Lau elected to pursue a strategy to preserve her employment.

supposed to be working as a server and bartender. This information was previously not disclosed to Suarez-Lau.

34.     Suarez-Lau texted Bishop, who informed Suarez-Lau that server shifts were not available.[9]

35.     On July 12, 2019, Suarez-Lau tried to pick-up a bar shift (using the HotSchedules app) for July 13, 2019. However, Messina quickly denied it.

36.     On July 27, 2019, in response to Suarez-Lau's question about her inability to log-in the HotSchedules app, Bishop texted Suarez-Lau: "Cause you don't work here." Bishop's text message was the first time a manager advised Suarez-Lau of her work status.

37.     On or about August 17, 2019, Kevin Lee Galvez, who is a Hispanic male bartender at The Balcony, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

38.     Since June 28, 2019, PDKN hired numerous new bartenders, including, but not limited to, two non-pregnant White females, one non-pregnant Hispanic female and one White male.

**COUNT I**
**TITLE VII (DISPARATE TREATMENT)**
**PREGNANCY DISCRIMINATION**

39.     Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

40.     Suarez-Lau asserts this claim, which is based on Title VII, against PDKN's discriminatory decision to terminate her employment at The Balcony. Specifically, Suarez-Lau, who was a woman affected by pregnancy, was not treated by PDKN the same for all

---

[9] Messina and Bishop, during their respective communications with Suarez-Lau, suggested Suarez-Lau apply at one of the Bokampers Sports Bar & Grill restaurants or Bo's Beach, which are restaurants owned and operated by PDKN.

employment-related purposes, as other persons not so affected, but similar in their ability or inability to work when she was terminated for missing an unscheduled work shift.

41.     Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a).

42.     In 1978, the United States Congress amended Title VII with the PDA to explicitly extend protection to pregnant women. Specifically, under the PDA, "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work...." 42 U.S.C. § 2000e(k). Under the PDA, employers are not required to give pregnant women special treatment; instead, employers must only treat pregnant women the same as all other prospective or current employees.

43.     Suarez-Lau, who was pregnant at the time of her termination, was a member of a group protected by Title VII.

44.     Suarez-Lau, who possessed prior experience as a server and bartender at several restaurants, was qualified for the positions of server and bartender at The Balcony.

45.     Suarez-Lau suffered an adverse effect regarding her employment when PDKN terminated her employment at The Balcony for alleging missing an unscheduled work shift.

46.     Suarez-Lau suffered from PDKN applying different work and disciplinary rules to her circumstances than non-pregnant employees.

47.     Suarez-Lau is aware of at least one PDKN female employee, who was not affected by pregnancy, but missed at least two work shifts without being terminated by the company.

48.     PDKN's termination of Suarez-Lau was: (a) solely attributable to her pregnancy; and (b) totally unrelated to her ability or inability to perform the job or adhere to restaurant policies, procedures and protocols.

49.     PDKN's termination of Suarez-Lau was a result of intentional discrimination, which is demonstrated by at least four categories of circumstantial evidence.

50.     First, the close timing between PDKN's decision to terminate Suarez-Lau and the employer's knowledge of her pregnancy suggests discrimination. In particular, on May 12, 2019, Suarez-Lau learned she was pregnant and informed her boyfriend, who is shift key manager and server at The Balcony. On June 15, 2019, Dellatto, who was excited about the pregnancy, informed O'Neil about Suarez-Lau's pregnancy. Dellatto previously informed Messina, Bishop and Pierra about the pregnancy. Fourteen days later (specifically starting on June 29, 2019, and continuing to July 27, 2019), Suarez-Lau was constructively discharged by PDKN after she allegedly missed an unscheduled work shift.

51.     Second, PDKN provided more favorable treatment of employees of either sex who were not affected by pregnancy, childbirth or related medical conditions, but were similar in their violation of restaurant policies, procedures and protocols. Specifically:

        a.      Hernandez, who is a non-pregnant female bartender, continued to be
                employed by PDKN although she was terminated on two occasions
                (including terminated on June 30, 2019, for failing to show up for a shift)
                and   subsequently   re-hired   while   Suarez-Lau   was   constructively

10

discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

b.      Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

c.      Although PDKN managers informed Suarez-Lau that the restaurant did not have available bartending or server shifts, PDKN hired additional non-pregnant employees, including at least three females and one male, as bartenders immediately after her discharge.

52.      Third, evidence exists that casts doubts on the credibility of PDKN's explanation for the challenged action. Specifically, Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

53.      Fourth, evidence that PDKN violated or misapplied its own policy when it decided to terminate Suarez-Lau. Specifically, PDKN terminated Suarez-Lau although she adhered to restaurant protocol when she requested and received permission from the shift manager and the evening manager to leave after her morning "to volume" shift. Per restaurant protocol, Messina, who was serving as a bartender and not a bar manager on June 28, 2019, did not have the authority to demand Suarez-Lau to work an unscheduled double shift, especially

when the managers on duty had provided Suarez-Lau with permission to leave after her scheduled shift.

54.     As a direct, legal and proximate result of PDKN's discrimination, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

55.     PDKN's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Suarez-Lau's right to be free from discrimination based on pregnancy.

**COUNT II**
**TITLE VII (DISPARATE IMPACT)**
**PREGNANCY DISCRIMINATION**

56.     Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

57.     Suarez-Lau asserts this claim, which is based on Title VII, against PDKN for its disciplinary policy, practice or protocol regarding bartenders who fail to report to the restaurant for scheduled work shifts because, although the policy, practice or protocol is facially neutral, the policy, practice or protocol has caused a significant discriminatory effect on pregnant bartenders.

58.     PDKN schedules its bartenders at The Balcony to work various shifts. PDKN informs bartenders of their respective work schedules on HotSchedules, which is an employee scheduling app, and in writing, which is composed of a piece of paper that is posted in the manager's office. Once scheduled, a bartender is required to report to the restaurant approximately 10-15 minutes prior to the start time of the employee's shift.

59.     In the restaurant industry, the phrase "no call, no show" refers to an employee's absence from work without notifying the employer. Generally, PDKN managers elected not to

impose significant disciplinary actions for non-pregnant employees who "no called, no showed" for a work shift. For example:

    a.    Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

    b.    Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

60. Conversely, the policy, practice or protocol disproportionately affected, and currently affects, members of a protected group—pregnant women. Specifically, Suarez-Lau, who was pregnant at the time of her termination, was a member of a group protected by Title VII and was terminated by PDKN for declining the bar manager's demand for her to work an unscheduled shift after she was previously authorized by two other managers to leave the restaurant after her scheduled shift.

61. PDKN's reliance on this policy, practice or protocol cannot be justified by a substantial legitimate business necessity or reason.

62. PDKN's business rationale for its termination of Suarez-Lau and others similarly situated is pre-textual.

63. Even if PDKN could justify its policy, practice or protocol based on a business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

64.     As a direct result of PDKN's discriminatory policy, practice or protocol as described above, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

### COUNT III
### ADA (DISPARATE TREATMENT)
### PREGNANCY DISCRIMINATION

65.     Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

66.     Suarez-Lau asserts this claim, which is based on the ADA, against PDKN's discriminatory decision to terminate her employment at The Balcony. Specifically, Suarez-Lau, who was a woman affected by pregnancy, was not treated by PDKN the same for all employment-related purposes, as other persons not so affected, but similar in their ability or inability to work when she was terminated for missing an unscheduled work shift.

67.     Suarez-Lau, who was pregnant at the time of her termination, was disabled as defined by the ADA since her condition would have involved a substantial limitation on one or more of her major life activities include performing manual tasks, walking and working. Specifically, as the pregnancy progressed, Suarez-Lau would have been significantly restricted as to the condition, manner or duration under which she could have performed her duties as a bartender or server as compared to the condition, manner or duration under which the average person in the general population could perform those same activities. For example, Suarez-Lau would have been prohibited from lifting heavy items (including retrieving containers containing alcohol and buckets of ice between floors) during her pregnancy or operating in confined environments (i.e., limited spacing behind the bar with more than one bartender).

14

68.     Suarez-Lau is a qualified individual under the ADA. Specifically, Suarez-Lau was able to perform the essential functions of the bartender position at the time of her termination (and during the remainder of her pregnancy) with reasonable accommodation. In particular, in late June 2019, Suarez-Lau requested Pierra to provide her with a light duty assignment (specifically, hostess duties) during the last trimester of her pregnancy. Pierra informed Suarez-Lau that "we would figure it out when the time comes." Alternatively, PDKN could have provided Suarez-Lau with other temporary and reasonable accommodations that would not have substantially changed the position, including scheduling Suarez-Lau to work alone at a bar section; and staffing Suarez-Lau's bar section with a barback/runner who could perform any necessary heavy lifting.

69.     Suarez-Lau also was subjected to unlawful discrimination because of her pregnancy. Suarez-Lau was terminated by PDKN when it applied different work and disciplinary rules to her circumstances than non-pregnant employees when she did not stay to work an unscheduled double shift. In contrast, Suarez-Lau is aware of at least one PDKN employee, who was not affected by pregnancy, but missed at least two work shifts without being terminated by the company. PDKN's termination of Suarez-Lau was based on discrimination due to the following factors:

      a.    First, the close timing between PDKN's decision to terminate Suarez-Lau and the employer's knowledge of her pregnancy suggests discrimination. In particular, on May 12, 2019, Suarez-Lau learned she was pregnant and informed her boyfriend, who is shift key manager and server Anthony Dellatto. On June 15, 2019, Dellatto, who was excited about the pregnancy, informed O'Neil about Suarez-Lau's pregnancy. Dellatto

previously informed Messina, Bishop and Pierra about the pregnancy. Fourteen days later (specifically stating on June 29, 2019, and continuing to July 27, 2019), Suarez-Lau was constructively discharged by PDKN after she allegedly missed an unscheduled work shift.

b.  Second, PDKN provided more favorable treatment of employees of either sex who were not affected by pregnancy, childbirth, or related medical conditions, but were similar in their violation of restaurant policies, procedures and protocols. Specifically:

   i.  Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

   ii.  Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

   iii.  Although PDKN managers informed Suarez-Lau that the restaurant did not have available bartending or server shifts, PDKN hired additional non-pregnant employees, including at least three females and one male, as bartenders immediately after her discharge.

c.  Third, evidence exists that casts doubts on the credibility of PDKN's explanation for the challenged action. Specifically, Hernandez, who is a

16

non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

d.      Fourth, evidence exists that PDKN violated or misapplied its own policy when it decided to terminate Suarez-Lau. Specifically, PDKN terminated Suarez-Lau although she adhered to restaurant protocol when she requested and received permission from the shift manager and the evening manager to leave after her morning "to volume" shift. Per restaurant protocol, Messina, who was serving as a bartender and not a bar manager on June 28, 2019, did not have the authority to demand Suarez-Lau to work an unscheduled double shift, especially when the managers on duty had provided Suarez-Lau with permission to leave after her scheduled shift.

70.     As a direct, legal and proximate result of PDKN's discrimination, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

71.     PDKN's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Suarez-Lau's right to be free from discrimination based on pregnancy.

## COUNT IV
## ADA (DISPARATE IMPACT)
## PREGNANCY DISCRIMINATION

72.    Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

73.    Suarez-Lau asserts this claim, which is based on the ADA, against PDKN for its disciplinary policy, practice or protocol regarding bartenders who fail to report to the restaurant for scheduled work shifts because, although the policy, practice or protocol is facially neutral, the policy, practice or protocol has caused a significant discriminatory effect on pregnant bartenders.

74.    PDKN schedules its bartenders at The Balcony to work various shifts. PDKN informs bartenders of their respective work schedules on HotSchedules, which is an employee scheduling app, and in writing, which is composed of a piece of paper that is posted in the manager's office. Once scheduled, a bartender is required to report to the restaurant approximately 10-15 minutes prior to the start time of the employee's shift.

75.    In the restaurant industry, the phrase "no call, no show" refers to an employee's absence from work without notifying the employer. Generally, PDKN managers elected not to impose significant disciplinary actions for non-pregnant employees who "no called, no showed" for a work shift. For example:

> a.    Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the

18

permission of the closing manager and not remaining to work an unscheduled work shift.

    b.    Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

76.    Conversely, the policy, practice or protocol disproportionately affected, and currently affects, members of a protected group—pregnant women. Specifically, Suarez-Lau, who was pregnant at the time of her termination, was a member of a group protected by the ADA and was terminated by PDKN for declining the bar manager's demand for her to work an unscheduled shift after she was previously authorized by two other managers to leave the restaurant after her scheduled shift.

77.    PDKN's reliance on this policy, practice or protocol cannot be justified by a substantial legitimate business necessity or reason.

78.    PDKN's business rationale for its termination of Suarez-Lau and others similarly situated is pre-textual.

79.    Even if PDKN could justify its policy, practice or protocol based on a business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

80.    As a direct result of PDKN's discriminatory policy, practice or protocol as described above, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

## COUNT V
## FCRA (DISPARATE TREATMENT)
## <u>PREGNANCY DISCRIMINATION</u>

81.     Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

82.     Suarez-Lau asserts this claim, which is based on the FCRA, against PDKN's discriminatory decision to terminate her employment at The Balcony. Specifically, Suarez-Lau, who was a woman affected by pregnancy, was not treated by PDKN the same for all employment-related purposes, as other persons not so affected, but similar in their ability or inability to work when she was terminated for missing an unscheduled work shift.

83.     The FCRA (specifically, Section 760.10(1)(a), Florida Statutes) makes it an unlawful employment practice for an employer "[t]o discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

84.     Suarez-Lau, who was pregnant at the time of her termination, was a member of a group protected by the FCRA.

85.     Suarez-Lau, who possessed prior experience as a server and bartender at several restaurants, was qualified for the position of bartender at The Balcony.

86.     Suarez-Lau suffered an adverse effect regarding her employment when PDKN terminated her employment at The Balcony for alleging missing an unscheduled work shift.

87.     Suarez-Lau suffered from PDKN applying different work and disciplinary rules to her circumstances than non-pregnant employees.

88.     Suarez-Lau is aware of at least one PDKN female employee, who was not affected by pregnancy, but missed at least two work shifts without being terminated by the company.

89.     PDKN's termination of Suarez-Lau was: (a) solely attributable to her pregnancy; and (b) totally unrelated to her ability or inability to perform the job or adhere to restaurant policies, procedures and protocols.

90.     PDKN's termination of Suarez-Lau was a result of intentional discrimination, which is demonstrated by at least four categories of circumstantial evidence.

91.     First, the close timing between PDKN's decision to terminate Suarez-Lau and the employer's knowledge of her pregnancy suggests discrimination. In particular, on May 12, 2019, Suarez-Lau learned she was pregnant and informed her boyfriend, who is shift key manager and server at The Balcony. On June 15, 2019, Dellatto, who was excited about the pregnancy, informed O'Neil about Suarez-Lau's pregnancy. Dellatto previously informed Messina, Bishop and Pierra about the pregnancy. Fourteen days later (specifically starting on June 29, 2019, and continuing to July 27, 2019), Suarez-Lau was constructively discharged by PDKN after she allegedly missed an unscheduled work shift.

92.     Second, PDKN provided more favorable treatment of employees of either sex who were not affected by pregnancy, childbirth or related medical conditions, but were similar in their violation of restaurant policies, procedures and protocols. Specifically:

        a.     Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively

discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

b.   Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

c.   Although PDKN managers informed Suarez-Lau that the restaurant did not have available bartending or server shifts, PDKN hired additional non-pregnant employees, including at least three females and one male, as bartenders immediately after her discharge.

93.   Third, evidence exists that casts doubts on the credibility of PDKN's explanation for the challenged action. Specifically, Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

94.   Fourth, evidence that PDKN violated or misapplied its own policy when it decided to terminate Suarez-Lau. Specifically, PDKN terminated Suarez-Lau although she adhered to restaurant protocol when she requested and received permission from the shift manager and the evening manager to leave after her morning "to volume" shift. Per restaurant protocol, Messina, who was serving as a bartender and not a bar manager on June 28, 2019, did not have the authority to demand Suarez-Lau to work an unscheduled double shift, especially

when the managers on duty had provided Suarez-Lau with permission to leave after her scheduled shift.

95.     As a direct, legal and proximate result of PDKN's discrimination, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

96.     PDKN's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Suarez-Lau's right to be free from discrimination based on pregnancy.

**COUNT VI**
**FCRA (DISPARATE IMPACT)**
**PREGNANCY DISCRIMINATION**

97.     Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

98.     Suarez-Lau asserts this claim, which is based on the FCRA, against PDKN for its disciplinary policy, practice or protocol regarding bartenders who fail to report to the restaurant for scheduled work shifts because, although the policy, practice or protocol is facially neutral, the policy, practice or protocol has caused a significant discriminatory effect on pregnant bartenders.

99.     PDKN schedules its bartenders at The Balcony to work various shifts. PDKN informs bartenders of their respective work schedules on HotSchedules, which is an employee scheduling app, and in writing, which is composed of a piece of paper that is posted in the manager's office. Once scheduled, a bartender is required to report to the restaurant approximately 10-15 minutes prior to the start time of the employee's shift.

100.     In the restaurant industry, the phrase "no call, no show" refers to an employee's absence from work without notifying the employer. Generally, PDKN managers elected not to

impose significant disciplinary actions for non-pregnant employees who "no called, no showed" for a work shift. For example:

      a.    Hernandez, who is a non-pregnant female bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

      b.    Galvez, who is a male bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

101.    Conversely, the policy, practice or protocol disproportionately affected, and currently affects, members of a protected group—pregnant women. Specifically, Suarez-Lau, who was pregnant at the time of her termination, was a member of a group protected by the FCRA and was terminated by PDKN for declining the bar manager's demand for her to work an unscheduled shift after she was previously authorized by two other managers to leave the restaurant after her scheduled shift.

102.    PDKN's reliance on this policy, practice or protocol cannot be justified by a substantial legitimate business necessity or reason.

103.    PDKN's business rationale for its termination of Suarez-Lau and others similarly situated is pre-textual.

104.    Even if PDKN could justify its policy, practice or protocol based on a business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

105.    As a direct result of PDKN's discriminatory policy, practice or protocol as described above, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial

**COUNT VII**
**TITLE VII (DISPARATE TREATMENT)**
**RACIAL AND ETHNIC DISCRIMINATION**

106.    Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

107.    Suarez-Lau asserts this claim, which is based on Title VII, against PDKN's discriminatory decision to terminate her employment at The Balcony. Specifically, Suarez-Lau, who is a woman of Asian descent, was not treated by PDKN the same for all employment-related purposes, as other persons of other races, ethnicities and colors.

108.    Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [and] color. …" 42 U.S.C. § 2000e-2(a).

109.    Suarez-Lau, as a person of Asian descent, was a member of a group protected by Title VII.

110.    Suarez-Lau, who possessed prior experience as a server and bartender at several restaurants, was qualified for the position of bartender at The Balcony.

111.    Suarez-Lau suffered an adverse effect on regarding her employment when PDKN terminated her employment at The Balcony for missing an unscheduled work shift.

112.    Suarez-Lau suffered from PDKN applying different work and disciplinary rules to her circumstances than employees of other races, ethnicities and colors.

25

113. Suarez-Lau is aware of at least one PDKN employee, who was not a person of Asian descent, but missed at least two work shifts without being terminated by the company.

114. PDKN's termination of Suarez-Lau was: (a) solely attributable to her race, ethnicity and color; and (b) totally unrelated to her ability or inability to perform the job or adhere to restaurant policies, procedures and protocols.

115. PDKN's termination of Suarez-Lau was a result of intentional discrimination, which is demonstrated by at least three categories of direct and circumstantial evidence.

116. First, PDKN provided more favorable treatment to at least two employees who were not persons of Asian descent, but engaged in similar conduct in violation of restaurant policies, procedures and protocols. Specifically:

    a.    Hernandez, who is a Hispanic bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

    b.    Galvez, who is Hispanic, continued to be employed by PDKN although he failed to show up for a bartender shift on or about August 17, 2019.

    c.    Although PDKN managers informed Suarez-Lau that the restaurant did not have available bartending or server shifts, PDKN hired additional non-Asian persons, including two White females, one Hispanic female and one White male, as bartenders immediately after her discharge.

117.    Two, evidence exists that casts doubts on the credibility of PDKN's explanation for the challenged action. Specifically, Hernandez, who is a Hispanic female, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

118.    Third, evidence that PDKN violated or misapplied its own policy when it decided to terminate Suarez-Lau. Specifically, PDKN terminated Suarez-Lau although she adhered to restaurant protocol when she requested and received permission from the shift manager and the evening manager to leave after her morning "to volume" shift. Per restaurant protocol, Messina, who was serving as a bartender and not a bar manager on June 28, 2019, did not have the authority to demand Suarez-Lau to work an unscheduled double shift, especially when the managers on duty had provided Suarez-Lau with permission to leave after her scheduled shift.

119.    As a direct, legal and proximate result of PDKN's discrimination, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

120.    PDKN's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Suarez-Lau's right to be free from discrimination based on race, ethnicity and color.

## COUNT VIII
## TITLE VII (DISPARATE IMPACT)
## RACIAL AND ETHNIC DISCRIMINATION

121.    Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

122.    Suarez-Lau asserts this claim, which is based on Title VII, against PDKN for its disciplinary policy, practice or protocol regarding bartenders who fail to report to the restaurant for scheduled work shifts because, although the policy, practice or protocol is facially neutral, the policy, practice or protocol has caused a significant discriminatory effect on Asian bartenders.

123.    PDKN schedules its bartenders at The Balcony to work various shifts. PDKN informs bartenders of their respective work schedules on HotSchedules, which is an employee scheduling app, and in writing, which is composed of a piece of paper that is posted in the manager's office. Once scheduled, a bartender is required to report to the restaurant approximately 10-15 minutes prior to the start time of the employee's shift.

124.    In the restaurant industry, the phrase "no call, no show" refers to an employee's absence from work without notifying the employer. Generally, PDKN managers elected not to impose significant disciplinary actions for non-Asian employees who "no called, no showed" for a work shift. For example:

> a.    Hernandez, who is a Hispanic bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission

28

of the closing manager and not remaining to work an unscheduled work shift.

b.     Galvez, who is a Hispanic bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

125.    Conversely, the policy, practice or protocol disproportionately affected, and currently affects, members of a protected group—Asians. Specifically, Suarez-Lau, who is Asian is a member of a group protected by Title VII and was terminated by PDKN for declining the bar manager's demand for her to work an unscheduled shift after she was previously authorized by two other managers to leave the restaurant after her scheduled shift.

126.    PDKN's reliance on this policy, practice or protocol cannot be justified by a substantial legitimate business necessity or reason.

127.    PDKN's business rationale for its termination of Suarez-Lau and others similarly situated is pre-textual.

128.    Even if PDKN could justify its policy, practice or protocol based on a business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

129.    As a direct result of PDKN's discriminatory policy, practice or protocol as described above, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

## COUNT IX
## FCRA (DISPARATE TREATMENT)
## RACIAL AND ETHNIC DISCRIMINATION

130.    Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

131.    Suarez-Lau asserts this claim, which is based on the FCRA, against PDKN's discriminatory decision to terminate her employment at The Balcony. Specifically, Suarez-Lau, who is a person of Asian descent, was not treated by PDKN the same for all employment-related purposes, as other persons of other races, ethnicities and colors.

132.    The FCRA (specifically, Section 760.10(1)(a), Florida Statutes) makes it an unlawful employment practice for an employer "[t]o discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

133.    Suarez-Lau, as a person of Asian descent, was a member of a group protected by the FCRA.

134.    Suarez-Lau, who possessed prior experience as a server and bartender at several restaurants, was qualified for the position of bartender at The Balcony.

135.    Suarez-Lau suffered an adverse effect on regarding her employment when PDKN terminated her employment at The Balcony for missing an unscheduled work shift.

136.    Suarez-Lau suffered from PDKN applying different work and disciplinary rules to her circumstances than employees of other races, ethnicities and colors.

137.    Suarez-Lau is aware of at least one PDKN employee, who was not a person of Asian descent, but missed at least two work shifts without being terminated by the company.

138. PDKN's termination of Suarez-Lau was: (a) solely attributable to her race, ethnicity and color; and (b) totally unrelated to her ability or inability to perform the job or adhere to restaurant policies, procedures and protocols.

139. PDKN's termination of Suarez-Lau was a result of intentional discrimination, which is demonstrated by at least three categories of direct and circumstantial evidence.

140. First, PDKN provided more favorable treatment to at least two employees who were not persons of Asian descent, but engaged in similar conduct in violation of restaurant policies, procedures and protocols. Specifically:

    a.    Hernandez, who is a Hispanic female, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

    b.    Galvez, who is a Hispanic bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

    c.    Although PDKN managers informed Suarez-Lau that the restaurant did not have available bartending or server shifts, PDKN hired additional non-Asian persons, including two White females, one Hispanic female and one White male, as bartenders immediately after her discharge.

141. Two, evidence exists that casts doubts on the credibility of PDKN's explanation for the challenged action. Specifically, Hernandez, who is Hispanic, continued to be employed

by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.

142.    Third, evidence that PDKN violated or misapplied its own policy when it decided to terminate Suarez-Lau. Specifically, PDKN terminated Suarez-Lau although she adhered to restaurant protocol when she requested and received permission from the shift manager and the evening manager to leave after her morning "to volume" shift. Per restaurant protocol, Messina, who was serving as a bartender and not a bar manager on June 28, 2019, did not have the authority to demand Suarez-Lau to work an unscheduled double shift, especially when the managers on duty had provided Suarez-Lau with permission to leave after her scheduled shift.

143.    As a direct, legal and proximate result of PDKN's discrimination, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

144.    PDKN's unlawful actions were intentional, willful, malicious and/or done with reckless disregard to Suarez-Lau's right to be free from discrimination based on race, ethnicity and color.

**COUNT X**
**FCRA (DISPARATE IMPACT)**
**RACIAL AND ETHNIC DISCRIMINATION**

145.    Suarez-Lau re-alleges each and every allegation contained in paragraphs 1-38, as if they were fully set forth herein.

146.    Suarez-Lau asserts this claim, which is based on the FCRA, against PDKN for its disciplinary policy, practice or protocol regarding bartenders who fail to report to the restaurant

for scheduled work shifts because, although the policy, practice or protocol is facially neutral, the policy, practice or protocol has caused a significant discriminatory effect on Asian bartenders.

147.    PDKN schedules its bartenders at The Balcony, to work various shifts. PDKN informs bartenders of their respective work schedules on HotSchedules, which is an employee scheduling app, and in writing, which is composed of a piece of paper that is posted in the manager's office. Once scheduled, a bartender is required to report to the restaurant approximately 10-15 minutes prior to the start time of the employee's shift.

148.    In the restaurant industry, the phrase "no call, no show" refers to an employee's absence from work without notifying the employer. Generally, PDKN managers elected not to impose significant disciplinary actions for non-Asian employees who "no called, no showed" for a work shift. For example:

>    a.    Hernandez, who is a Hispanic bartender, continued to be employed by PDKN although she was terminated on two occasions (including terminated on June 30, 2019, for failing to show up for a shift) and subsequently re-hired while Suarez-Lau was constructively discharged, and later discharged, for concluding a scheduled shift with the permission of the closing manager and not remaining to work an unscheduled work shift.
>
>    b.    Galvez, who is a Hispanic bartender, continued to be employed by PDKN although he failed to show up for a shift on or about August 17, 2019.

149.    Conversely, the policy, practice or protocol disproportionately affected, and currently affects, members of a protected group—Asians. Specifically, Suarez-Lau, who is

Asian, is a member of a group protected by the FCRA and was terminated by PDKN for declining the bar manager's demand for her to work an unscheduled shift after she was previously authorized by two other managers to leave the restaurant after her scheduled shift.

150.    PDKN's reliance on this policy, practice or protocol cannot be justified by a substantial legitimate business necessity or reason.

151.    PDKN's business rationale for its termination of Suarez-Lau and others similarly situated is pre-textual.

152.    Even if PDKN could justify its policy, practice or protocol based on a business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

153.    As a direct result of PDKN's discriminatory policy, practice or protocol as described above, Suarez-Lau sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

154.    WHEREFORE, Suarez-Lau requests this Court issue judgment against PDKN as follows:

a.    Declaring PDKN's policies, practices, protocols and other decisions as alleged in this Complaint are unlawful;

b.    Reinstating or re-hiring Suarez-Lau as a bartender, pursuant to 42 U.S.C. § 2000e-5(g); 42 U.S.C. § 12117; Fla. Stat. § 760.11(5); and any other applicable federal or state law;

c.    Awarding back and front pay; lost or unpaid wages; and other compensation, in an amount to be proven at trial, pursuant to, 42 U.S.C. §

2000e-5(g); 42 U.S.C. § 12117; Fla. Stat. § 760.11(5); and any other applicable federal or state law;

d.     Awarding compensatory and punitive damages, in an amount to be proven at trial; pursuant to 42 U.S.C. § 1981a(b); 42 U.S.C. § 12117; Fla. Stat. § 760.11(5); and any other applicable federal or state law;

e.     Awarding interest on pay, compensation and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

f.     Enjoining PDKN from engaging in the unlawful acts complained in this Complaint;

g.     Awarding attorney's fees, costs and expenses to Suarez-Lau's legal counsel, pursuant to 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 12205; Fla. Stat. § 760.11(5); and any other applicable federal or state law; and

h.     Granting such other relief (in law or equity) to Suarez-Lau as this Court may deem just and proper.

## **JURY DEMAND**

155.    Suarez-Lau demands a trial by jury of all issues so triable pursuant to Federal

Rule of Civil Procedure 38.

Dated: June 9, 2020.                         Respectfully submitted,

                                             s/ Michael L. Buckner
                                             _____
                                             Michael L. Buckner, Esquire
                                             Florida Bar No. 106331
                                             Email: michaelbucknerlaw@gmail.com
                                             Michael L. Buckner Law Firm, P.A.
                                             4977 NW 67th Avenue
                                             Lauderhill, Florida 33319
                                             Office: +1-954-347-0112
                                             Facsimile: +1-954-578-1440

                                             Attorney for the Plaintiff, Julisa Suarez-Lau